[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I
On January 14, 2000, and Order of Temporary Custody (hereinafter "OTC") was granted to the Department of Children and Families (hereinafter "the Department") of the minor children, Stephanie, Sean and Erica. On that same date, the Department filed neglect petitions alleging Stephanie and Sean to be neglected/abused and Erica to be neglected. A contested OTC hearing was held on January 31 and February 2, 2000 in Middletown after which Judge Quinn sustained the OTC, ruling that the Department had proven by a preponderance of evidence that the allegations made by Stephanie were true, and found all three children to be at risk of physical injury with the family home. This Court ordered that all evidence presented at the trial in Middletown be preserved for the neglect trial in Rockville. The neglect trial was held, which took eight days, beginning July 14, 2000 and ending January 8, 2001. Transcripts and briefs were ordered and the last brief received by the Court was mother's brief dated June 11, 2001. This Court heard from thirteen witnesses and accepted twenty-six exhibits into evidence.
The Department became involved with this family on September 30, 1999 when they received a referral regarding sexualized behavior by Sean with a six year old neighborhood boy. On October 1, 1999, while being interviewed by a Department social worker, Stephanie stated that her stepfather, Daniel A., had pulled down her pants and touched her private parts, told her that he wanted to lick her down there, and that she had CT Page 13566 seen him "hump" Sean. The parents were also interviewed that day, and stepfather denied all allegations of sexual abuse. The parents signed a service agreement with the department on that date agreeing that stepfather would leave and remain out of the home, and have no contact with the children until approved by the Department. On October 6, 1999 Stephanie recanted her allegations of sexual abuse and stated that her mother told her that if she did not tell the Department and the police that she was lying about her stepfather sexually abusing her, that Mr. A. would go to jail and the family would lose their home. She also stated that her paternal grandmother told her to lie about the sexual abuse allegations or stepfather would go to jail. On January 10, 2000 the Department received a referral that Mr. A. had been seen dropping Stephanie off at the home. Several interviews were conducted which substantiated this claim and on January 11, 2000 a 96-hour hold was invoked on all three children. The OTC was requested and granted on January 14, 2000 and sustained on February 2, 2000 after a contested evidentiary hearing. Specific Steps were ordered for Mr. and Mrs. A. on January 14, 2000 and again on February 2, 2000.
This Court has reviewed the transcripts of the contested OTC hearing held before Judge Quinn (Exhibits 7 and 8) and has considered the testimony of witnesses who testified before this Court regarding the events which lead up to the filing of these petitions, and finds no evidence which would lead this Court to make findings inconsistent with those of Judge Quinn. Accordingly Stephanie is hereby adjudicated as a neglected child in that she was being denied proper care and attention, physically, emotionally and morally; was being permitted to live under conditions, circumstances or associations injurious to her well-being; and was sexually abused. Sean and Erica are hereby adjudicated as neglected in that they were being permitted to live under conditions, circumstances or associations injurious to their well-being.
The most troubling aspect of this case is the issue of what is now in the best interest of these children. They have been out of their home since January 11, 2000 and there continues to be no clear plan as to when and under what circumstances they should return home.
 II
Stephanie
Stephanie has been hospitalized on at least two occasions (3/21/00-3/25/00 and 4/5/00-5/10/00) for self-injurious behaviors and suicidal ideation. She has had hospitalization, safe home, foster home, shelter, and residential placement. She has run away from placement numerous times. On May 26, 2000, during a diagnostic interview by CT Page 13567 Kathleen Barrett at the Children's Center at St. Francis Hospital, Stephanie retracted her prior recantation and confirmed her earlier allegations of sexual abuse by her stepfather. She further, gave extensive details about the incidents and about the alleged incident between stepfather and Sean. Stephanie has never since that time changed her story regarding the allegations of sexual abuse. None of the numerous clinicians who have interviewed or treated this child have stated that they do not believe her allegations of sexual abuse.
Several witnesses testified that Stephanie has expressed that she feels responsible for the fact that her family is no longer together as a result of her disclosure of sexual abuse. Joseph Lesiak, Stephanie's therapist while she was placed at the Children's Center of Hamden, testified that she said she loves her mother very much; is sorry she has caused her this problem; feels that mom has been sad a long time; wants to be with her mother; and feels her mother is a good mother. She has, nonetheless, maintained that the sexual abuse happened and has talked about it more in group therapy. Lori Orend, Stephanie's therapist at St. Francis Behavioral Health, testified that she found if significant that Stephanie never wavered on the issue of whether the abuse occurred even though she had a lot to lose by reporting the abuse. Mr. Lesiak testified that Stephanie stated she did not want to return home if stepfather was there. She was angry about what happened to her and was afraid it could happen again. Mr. Lesiak recommended continued residential placement for Stephanie.
Sean
Sean had consistently denied that he has ever been sexually abused, been put into any uncomfortable position, or been exposed to it in the home. He also denied exposing himself to the six year old boy, although there seems to be no question about that incident. Dr. Dell, Sean's therapist at Wheeler Clinic testified on November 9, 2000, that he had been working with Sean for approximately six months. He stated that Sean was uncomfortable whenever asked to talk about the incident with the boy or if he knew anything about what happened to his sister Stephanie. Sean was usually talkative and open but would shut down on these topics. He felt that Sean feels torn in that if he acknowledges anything that he would be damaging his family. Sean has consistently expressed a desire to return home. Dr. Dell stated that Sean should not return to the home until father is engaged in services consistent with the recommendations of Dr. Bunk. He did not agree with Dr. Bunk's recommendation, however, that supervised visitation with stepfather should have begun as soon as possible, because he felt it would put the child in a bad position. He felt that visitation should be in a therapeutic context. Dr. Dell strongly recommended family therapy to include all family members. He CT Page 13568 recommended that prior to family therapy occurring, the parents should complete a psych-educational course on sexual abuse, and that the family would have to acknowledge that sexual abuse occurred and support the victim.
Department social worker, Stephania Agliano[1] spoke with Sean on November 15, 2000 because he had gotten into some legal trouble. During that conversation they were discussing telling the truth. She asked Sean if he felt that telling the truth would get him into trouble and maybe cause him not to be able to go home. She asked Sean about the allegation that he had pulled his pants down and exposed himself to the six year old boy. Sean said yes he had. She talked to Sean about the allegations made by Stephanie and whether he thought they were true. He said maybe for her but not for him. She asked him if what Stephanie said was true, would he tell. He said that he would have to ask his mom if she would be mad. They then did role playing during which Stephania played his mother. Sean then said that he had something to tell mom — that father[2] touched his private parts. He said he would be a little afraid to go home if father was there and that he wants father to get help. She asked him if he would feel safe if he went home and father was there. Sean said he "kind of wouldn't", because if it happened before, it could happen again.
Erica
There are no allegations that Erica has ever been sexually abused in any way. She was removed from the home because of the allegations of sexual abuse by Stephanie and it was felt that she could possibly be in danger if left in the home with father present. Erica doesn't have an understanding of why she cannot be with her mother and father. She misses her parents and wants to go home. Erica had only a few therapy sessions and was discharged because she was no longer in need of therapy.
Lynne A.
Mother's initial reaction to Stephanie's allegations of sexual abuse by her husband was that it could not be true. She has maintained various forms of this sentiment throughout this process. When Stephanie first disclosed, she got angry with her and told the child that she should tell the police she had lied because father would go to jail, the family would lose the house and mother's life would be messed up. She stated to several people that she was waiting for more or clearer evidence before she would know if she believes Stephanie . . . She has stated that she believes both Stephanie and her husband. She has stated that she doesn't know what to believe. CT Page 13569
She signed a service agreement with the Department in October, 1999 in which she agreed that Mr. A. would not reside in the home until approved by the Department. Mr. A. returned to the home in January, 2000, in violation of that agreement. He left the home again in April, 2000 and returned again in November, 2000. The Department was not informed of his return. She testified, however, that if the children are returned to her she would not allow father to reside in the home and that she would keep them safe and call 911 if he came to the home. She stated that she would prefer to have the whole family home but would abide by any order that her husband not reside in the home. In that same testimony, she testified that she knows her husband, he is a good person and it is hard for her to believe that he would do something like that.
The Department has expressed concerns from the beginning of this case about mother's dependency on her husband. She did not work, did not drive and was totally dependent on him for transportation, appeared to have few friends and was not involved in any activities or supportive groups. She has since become employed and appears to enjoy it very much; began handling her own finances; and had made calls to check on prices for driving school.
In April, 2000, she began therapy with Phyllis Dindas, who as of her testimony on December 18, 2000, had seen mother ten times. They focused primarily on issues around reunification with the children and on the children's safety. She stated that mother had been more independent when she began working with her, but had not appeared so independent lately. She was concerned that father may have been coming over to the house at least once per week to do repairs. Ms. Dindas believes that mother cares for her children deeply and cares for her husband; and that it would be a problem for mother if the children were returned to the home and father was ordered not to be in the home. Dr. Barbara Bunk testified that it would be difficult for mother to learn the skills required to maintain an intimate relationship with her husband while at the same time being clearly protective and supportive of her children. Both clinicians stated that mother would need a high level of ongoing systemic support as she moves toward reunification with her children. Ms. Dindas suggested that possibly the youngest child should return home first.
Regarding the Specific Steps, mother has kept her appointments with the Department and kept her whereabouts known; satisfactorily completed the parenting classes the Department referred her to; participated in the Family Education Seminar, a series of educational sessions conducted by Mr. William Hobson for offenders and family to give support and to help family members become appropriate supervisors for visitation; and engaged in individual counseling, although Ms. Agliano testified on November 30, 2000, that mother was no longer in her therapy and needed to be. There CT Page 13570 remains concern that mother has not pursued training directed at clarifying and developing assertiveness, self-esteem and self-confidence as well as other issues related to individualization and independence, as recommended by Dr. Bunk.
Daniel A.
Mr. A. has steadfastly denied any wrongdoing towards Stephanie or Sean. He, therefore, has not engaged in any counseling for sexual offenders. He did participate in parenting classes and the Family Education Seminar conducted by Mr. Hobson, which Mr. Hobson described as educational classes, not therapy or counseling which would meet the criteria of the recommendations of Dr. Bunk. Social worker Ms. Agliano testified on November 30, 2000, that father was engaged in individual therapy with Dr. Benson, basically working on stress issues.
Mr. A. was evaluated by Mr. William Hobson, a specialist in the field of treatment of sexual offenders, and by Dr. Barbara Bunk, who specializes in working with families in which sexual abuse has occurred. Mr. Hobson stated that if Stephanie's allegation are accurate, the most obvious concern would be Mr. A.'s staunch denial and, along with that, his wife's unwavering belief of his innocence. This would prevent a more thorough assessment of the dynamics leading to his offending and would also be a serious impediment to effective participation in treatment to address the offending behavior which would certainly be a recommendation if it was determined that he had offended his stepdaughter. If the allegations by Stephanie are not true, there is the question of why she would make such allegations and why she would chose to make sexual abuse allegations rather than physical or emotional abuse claims. He further stated that if Mr. A. committed the alleged acts, he would have concern about whether Stephanie might be more vulnerable to future sexual abuse when stepfather returns home due to the fact that her allegations were not believed and because of any feelings of guilt she might have for having caused a temporary separation of family members. If no clear finding regarding the validity of the allegations can be made, Mr. Hobson suggested that Mr. A. might, as part of the reunification process, take responsibility in a general way by stating that he regrets and takes responsibility for anything he may have done that has caused Stephanie to feel uncomfortable in his presence. Although this is vague, it can serve as an acknowledgment of her feelings and may also be a way to put some closure on this situation. Hopefully, he could also reassure her that he will not hold against her in the future the fact that she made these claims. This communication should occur in a formal counseling session, with Stephanie's therapist present, prior to them residing in the home together. CT Page 13571
Mr. Hobson suggested that Mr. A. might participate in a lie detector test, which he initially agreed and later refused to do. Mr. A. asserts that it is somehow the Department's fault that he did not do the lie detector test, which makes no sense.
Mr. Hobson also stated, however, that there was no known evidence of a propensity on Mr. A.'s part toward involvement in activities which involve children or was suggestive of a pedophilic attraction to minors. This lead him to the conclusion that, if he offended against his stepdaughter, the behavior was more of an uncharacteristic regression and departure from his typical lifestyle rather than a function of a chronic sexual/emotional attraction to children. He further stated that in general, offenders of this type have a lower recidivism rate and can be helped to further reduce that risk through effective participation in specialized sex offender treatment.
Mr. A. impressed Dr. Bunk as highly unlikely to be an adequate reporter of the complexity of his troubled home life. She saw him as either highly defensive or as presenting himself falsely. In either case, he would be unlikely to be psychologically inclined to admit wrongdoing, particularly that which is characterized by behaviors which would be considered immoral, such as sexual abuse of a child. It was her impression that one or more children in this family have been sexually abused, and that it seems necessary to clearly address the possibility that Mr. N is the perpetrator.
 III
Dr. Bunk recommended intensive, long-term family treatment for sexual abuse with the following components:
 1. The children should continue to live outside of the home at this time (her evaluation report is dated March 20, 2000). A disinterested authority should supervise frequent visits between children and each or both parents.
 2. Mother should engage with a psychotherapist knowledgeable about all aspects of sexual abuse, including those of the sexual offender and non-offending parent.
 3. Mother and stepfather should both engage in parenting classes, specifically addressing issues of anger and conflict resolution; reflective listening; child development; discipline; domestic CT Page 13572 violence; sexual and physical abuse of children.
 4. Mr. A. must engage in group therapy for sexual offenders against children. This should be for a period of time determined by the treatment providers, though not for less than 1-3 years.
 5. Mrs. A. should pursue training directed at clarifying and developing assertiveness, self-esteem and self-confidence as well as other issues related to individualization and independence.
 6. Each child must be engaged in therapy with persons who are (a) knowledgeable about intrafamilial sexual abuse, and (b) willing to cooperate with all other treatment providers.
 7. Sean should be engaged in treatment specifically for youths who are sexually offensive or sexually reactive.
 8. All treatment should proceed as initiated for at least 1-3 years, at which time providers can re-evaluate.
She further recommended that reunification of the family (completely or in part) should only occur with the agreement of the entire treatment team or those professionals that are directly involved with the parities who are reuniting; and that reunification should only occur when the reuniting parent can identify and accept full responsibility for their offensive behaviors in the past and present.
The Department's position is to follow the recommendations of Dr. Bunk, and they have expressed that to the parents. Most of the clinicians who testified agreed with all or some of Dr. Bunk's recommendations or proposed recommendations similar to hers. As of the close of testimony, Dr. Bunk's recommendations had not been fully complied with by either mother or father.
Sean's therapist, Dr. Dell, testified that he agreed with Dr. Bunk's recommendations, and that the children should live outside of the home until the recommendations are met. He felt that this is important so that the children can believe that the adults in their life are taking things seriously and are supportive of them. They need to sense accountability on the part of the parents. He also strongly recommended that Sean and CT Page 13573 his family engage in a family therapy experience to help them reunite and integrate this experience into the family's life.
Mother's therapist, Phyllis Dindas, recommended a reunification plan which included increased visitation, supervised home visits, a parent aide, mother's continued participation in individual therapy and family therapy with the children.
Libby Arny, Stephanie's therapist at Connecticut Children's Place (May, 2000) testified that she would hesitate to send Stephanie home if father was there. She stated that what mother needed to do to get Stephanie home was to be supportive of her, work through her feelings about this situation and determine her relationship with father.
Joseph Lesiak, Stephanie's therapist at the Children's Center of Hamden stated that Stephanie seemed to realize that she could not return home if her stepfather was in the home. Stephanie has said that one of the considerations her mother has to make is whether to choose her over her stepfather. On November 1, 2000, Stephanie stated to Mr. Lesiak that she believes mother has chosen stepfather over her.
There have been numerous clinicians and providers involved with this family which has resulted in several variations on the theme of what should happen with these children. There is consistency, however, in the fact that there should be reunification in some form at some point. At this point, almost all of the testimony dates back a year or more ago. Residential treatment is indicated for Stephanie with a transition to a group home or the independent living program when appropriate. Her stepfather continues to deny her allegations, and she has continued to maintain that they are true. Therefore, it would not be possible for her to return to the home if stepfather is there. Stepfather is in the home, and although mother verbalizes that she will have him leave the home and not return until therapeutically appropriate and that she will be able to manage without him in the home, there has been nothing presented in these eight days of trial which would give this Court confidence that she would be capable of or willing to carry out her verbalizations. Mother, in her brief has proposed that Stephanie be committed to the Department. Her choice regarding Stephanie and her husband has been made clear. This Court finds it in Stephanie's best interest that she be committed to the Department of Children and Families until further order of the Court, and it hereby ordered.
Sean's situation is more troubling. Witnesses have testified, and this Court is aware, that children who have been sexually abused or exposed to sexual abuse in some way, can take a very long time in therapy before making any disclosures. Sean would appear to be an example of that CT Page 13574 premise. He had been consistent in his denial that anything had happened to him, and in his concern for his family's welfare and his mother's feelings. It was not until November 15, 2000 that he made any statements which suggest that he might have in fact been sexually abused. He also stated then that he would be a little afraid to go home if his stepfather was there ("if it did happen") and that he wanted his stepfather to get help. This Court hopes (and suspects) that Sean has made significant progress in his therapy since that date. Based, however, on the evidence presented, this Court finds it in Sean's best interest to be committed to the Department of Children and Families until further order of the Court, and it is hereby ordered.
Erica, five years old when removed from her parents' care twenty-one months ago, has been living in a state of sadness and confusion over why she was removed from her home and why she has not been allowed to return. Erica does not need to be in therapy about intrafamilial sexual abuse; no one needs to make a statement of responsibility to her or accept (or explain) accountability to her. She needs to be kept safe from abuse. Despite the various recommendations concerning what should happen and when the "children" should go home, this Court is of the opinion that given the length of time that the Department and the court have been involved with this family and in light of all that mother has gone through, she would be diligent in protecting Erica from harm. Although it has been slow by some standards, mother has made progress in her personal growth and self esteem, and hopefully has gained enough insight to understand that if Erica is ever found to have been sexually abused by Mr. A. (or anyone else) that she would be again removed from her care and it would likely be permanent. Two courts have now ruled that Stephanie's allegation of sexual abuse by her stepfather are true. Mother must govern herself accordingly. It is, therefore, the order of this Court that Erica be returned home under Protective Supervision for a period of one year, effective upon written proof submitted to this Court that Mr. A. is enrolled in "a specialized sexual offender treatment program with an agency or individual with expertise in this field, as evidenced by clinical membership in the Connecticut Association for Treatment of Sexual Offenders, the Association for Treatment of Sexual Abusers, or a similar professional organization". (Recommendation of Mr. William Hobson) Additionally, the services of a parent aid are ordered to be in place immediately upon Erica's return home, and parents are ordered to cooperate with said service. Mother is ordered, if she has not already done so, to re-engage in individual therapy immediately and to attend consistently.
This Court further orders that a judicial in-court review be scheduled in two months to finalize the Specific Steps consistent with the recommendations of service providers in conjunction with the current CT Page 13575 state of the children's therapy and the progress of the parents.
The Department is ordered to file a motion for review of a permanency plan and to maintain or revoke the commitments of Stephanie and Sean, by no later that July 5, 2002
P. Harleston, J.